**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ZOO CAPITAL HOLDINGS, LLC (identified in Defendant's forms as 'Zoo Capital Holding LLC'), AD HOSPITAL EAST, LLC, CARECAPITAL, LLC, and ATUL 'LUCKY' CHOPRA,<br><br>*Plaintiffs,*<br>-against-<br><br>TITAN CAPITAL GRP, DAVID A. JASKOWLSKI, and EXCELSIOR CAPITAL SERVICES LLC,<br>*Defendants.* | Case No.: ____________<br><br>**COMPLAINT** |

Plaintiffs Zoo Capital Holdings, LLC ('Zoo Capital'), AD Hospital East, LLC ('AD Hospital East'), Carecapital, LLC ('Carecapital'), and Atul 'Lucky' Chopra ('Chopra') (collectively, 'Plaintiffs'), by their attorneys, Heskin & Proper, PLLC, allege against Defendants Titan Capital GRP ('Titan' or 'TCG'), David A. Jaskowlski ('Jaskowlski'), and Excelsior Capital Services LLC ('Excelsior') as follows:

**NATURE OF THE ACTION**

1. This action arises from Titan's ongoing scheme to make and collect fixed-term, high-interest business loans while disguising them as purchases of future receivables.

2. Defendant David A. Jaskowlski conceived and executed the scheme's solicitation and 'carroting' component. He approached Plaintiffs through Defendant Excelsior Capital Services LLC by promising a larger and longer-term refinancing facility, then used that promised refinancing as the carrot to induce Plaintiffs into a succession of short-term, high-interest Titan MCAs.

3. Jaskowlski initially represented that Excelsior specialized in financing behind an existing senior facility and could provide Plaintiffs a $2–5 million bridge facility immediately

without disrupting their senior lender. He simultaneously pursued a proposed thirty-six-month facility that he represented could close in four to six weeks.

4. While holding out that larger refinancing, Jaskowlski introduced Plaintiffs to Getter—whom Jaskowlski described as his 'short term capital partner'—and directed Plaintiffs to Titan for interim MCA funding. Jaskowlski and Getter had worked together for years, and their contemporaneous emails show Jaskowlski conferring with Getter about Titan's fees, payment periods, documents, funding deadlines, and repeated weekly advances.

5. The promised refinancing did not arrive. Instead, Jaskowlski and Getter placed Plaintiffs into one Titan MCA after another, each carrying a fixed 1.40 repayment factor, a short and predictable payment period, and a daily debit untethered to actual receivables. Each new transaction paid or rolled Titan's prior balance and exposed Plaintiffs to still larger fixed debits.

6. Jaskowlski earned a commission on each Titan transaction he brokered. He therefore profited each time Plaintiffs accepted another short-term MCA while waiting for the larger refinancing he had promised, giving him a direct financial incentive to keep Plaintiffs on Titan's refinancing treadmill rather than deliver durable financing.

7. Jaskowlski acted through Excelsior at all relevant times. Excelsior was the enterprise's solicitation and brokerage vehicle, received or benefited from the commissions generated by the Titan transactions, and supplied the apparent promise of conventional bridge and long-term financing that induced Plaintiffs to enter the serial-MCA cycle.

8. Titan's form says that it purchased 40% of Plaintiffs' future receipts and that each fixed daily ACH debit is a 'good faith estimate' of that 40%. The documents' own arithmetic disproves those statements.

9. Over just thirty-six days, Titan caused Plaintiffs to execute five materially identical instruments. Although the purported purchased percentage never changed from 40%,

Titan's supposed estimate of Plaintiffs' daily receipts climbed from $26,250 to $150,000—a 471% increase—precisely as the size of each advance increased.

10. The only stable relationship was between the dollars Titan advanced and the dollars Titan demanded back. Each instrument imposed a 1.40 factor rate and a fixed daily debit calculated to retire the face balance in a predictable number of business days.

11. Titan did not identify, underwrite, schedule, or assume the collection risk of any specific receivable. It required daily payment from Plaintiffs' general operating account, reserved control over reconciliation, prohibited other financing and bank-account changes, took liens on every asset and every account regardless of source, imposed personal liability after broadly drafted defaults, and claimed the power to accelerate the entire face amount.

12. This is the structure recently held to be a loan as a matter of law in *Togut v. eProdigy Financial, LLC (In re Kossoff PLLC)*, 2026 Bankr. LEXIS 1850, at *16–46 (Bankr. S.D.N.Y. July 27, 2026). The court described the documents as a well-drafted effort to characterize high-return financing as an asset sale, but held that the fixed daily payment, discretionary and prospective-only reconciliation, de facto term, sweeping collateral, acceleration, and guaranty made the transaction a loan. *Id.* at *19–20.

13. Titan's estimated-receivables fiction is also the one rejected in *Lateral Recovery LLC v. Funderz.net, LLC*, 2024 U.S. Dist. LEXIS 176985, at *81–83 (S.D.N.Y. Sept. 27, 2024), and found plausibly loan-like in *Golden Foothill Insurance Services, LLC v. Spin Capital, LLC*, 2025 U.S. Dist. LEXIS 160562, at *21–25 (S.D.N.Y. Aug. 19, 2025). Titan's numbers are even more stark: its supposed daily-receipts estimate rose 5.714 times in thirty-six days without any change to the 40% purchased percentage.

14. The transactions are loans under Texas and New York substance-over-form law. Excluding Titan's additional fees, their facial annualized rates range from approximately 63% to

86.7%. They exceed twice even Texas's highest statutory commercial-credit ceiling of 28% and exceed New York's 25% criminal-usury limit where applicable.

15. Titan also drafted the purported 'sales' to seize every payment deposited in Plaintiffs' accounts, including Medicare and Medicaid reimbursements, and to permit Titan to notify payors, redirect payments, endorse instruments, and collect for itself. Federal law does not permit Medicare or Medicaid provider payments to be made to or through a factor under an assignment or power of attorney. 42 U.S.C. §§ 1395g(c), 1396a(a)(32); 42 C.F.R. §§ 424.73–.74, 447.10.

16. That overreach is especially dangerous because AD Hospital East is an active Texas general acute-care hospital, operates around-the-clock emergency and clinical services, and accepts Medicare. A frozen operating account, a UCC notice sent to a government or commercial payor, or an ex parte attachment could interrupt payroll, pharmaceuticals, supplies, patient care, and regulated reimbursement relationships.

17. Texas enacted Chapter 398 of its Finance Code specifically to regulate commercial sales-based financing. The statute applies to online financing offered to a Texas recipient regardless of the provider's physical presence, removes sales-based financing from the statutory 'account purchase' safe harbor, and prohibits an automatic-debit mechanism unless the provider holds a validly perfected, first-priority security interest. Tex. Fin. Code §§ 398.002, 398.004, 398.056.

18. Titan's July 10, July 16, July 30, and August 5, 2026 instruments postdate the July 9, 2026 effective date of 7 Tex. Admin. Code § 86.313. That rule confirms that recurring preauthorized debits are automatic and that a provider must have a perfected first-priority lien in all of the recipient's accounts receivable before establishing or accepting such debits.

19. Titan's agreements do not identify any UCC filing, filing jurisdiction, or priority search showing a first-priority lien. To the contrary, they force Plaintiffs to warrant away competing liens, create day-one defaults if that representation is false, and authorize Titan to file whatever notice it later chooses. Titan cannot manufacture statutory compliance by extracting a contractual representation that its own underwriting and UCC search should verify.

20. Titan further demanded a Connecticut prejudgment-remedy waiver purporting to permit attachment and garnishment without notice, hearing, or bond whenever Plaintiffs' bank has a Connecticut branch or registration. The clause operates like the confession-of-judgment devices Texas declared void in commercial sales-based financing. *See* Tex. Fin. Code § 398.055.

21. Plaintiffs seek a declaration that the loans, guaranty, security grants, ACH authorizations, and any UCC financing statements are void or unenforceable; cancellation of any UCC filings; restitution and damages; and preliminary and permanent relief preventing Titan from debiting Plaintiffs' accounts, invoking the Connecticut prejudgment-remedy waiver, contacting payors, or asserting ownership of Medicare or Medicaid receivables.

22. Yoel Elimelech Getter, also known as Yoel Getter ('Getter'), filed a Chapter 7 bankruptcy petition on July 7, 2026. He is not named as a defendant, and Plaintiffs seek no relief against him or property of his bankruptcy estate. His conduct is alleged solely to identify the enterprise, Titan's controlling mind and scienter, the participants' relationships and roles, and the basis for Titan's own liability.

## **JURISDICTION AND VENUE**

23. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. §§ 1961–1968.

24. This Court has jurisdiction to declare the parties' rights under 28 U.S.C. §§ 2201 and 2202 and supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367 because all claims arise from the same five transactions and collection scheme.

25. The amount in controversy also exceeds $75,000, exclusive of interest and costs. Plaintiffs are citizens of Texas. Upon information and belief, Titan is not a citizen of Texas, although Titan concealed its precise entity form and jurisdiction in its own agreements.

26. Venue is proper under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because Titan states in every instrument that it has a place of business in New York; upon information and belief, Titan transacts its MCA and collection affairs in this District; Getter and other enterprise participants directed material acts from or through New York; and interstate DocuSign transmissions, funding wires, ACH instructions, and collection communications passed through New York. Venue is also proper because at least one Defendant resides in this District.

27. Titan's forms state that Titan may elect state court in Fairfield County, Connecticut, or Kings County, New York. That unilateral clause does not require this federal RICO and declaratory action to be filed in either forum, and in any event is part of the void and illegal instruments challenged here.

28. This Court has personal jurisdiction over Defendants because Jaskowlski resides in New York, Excelsior is based in New York and transacted the challenged brokerage and solicitation activity from New York, and because Titan maintains or represents that it maintains a New York place of business, repeatedly transacts affairs in New York, chose New York as one of its preferred enforcement forums, and used interstate wires and bank networks to originate and collect the challenged transactions.

## PARTIES

29. Plaintiff Zoo Capital Holdings, LLC is a Texas limited liability company headquartered in Houston. Titan's forms omit the final 's' and identify it as 'Zoo Capital Holding LLC.' Zoo Capital is a holding and management company associated with Texas healthcare operations, including the Advanced Diagnostics Healthcare System.

30. Plaintiff AD Hospital East, LLC is a Texas limited liability company and an active organization in the Centers for Medicare & Medicaid Services' National Plan and Provider Enumeration System under NPI 1669732178. Its primary taxonomy is General Acute Care Hospital.

31. AD Hospital East operates and supports East Houston Hospital & Clinics and affiliated facilities. The system provides 24-hour emergency and urgent care, surgery, diagnostic imaging, multispecialty care, and related hospital services. It accepts Medicare and commercial insurance and depends on uninterrupted operating cash and payer remittances.

32. Plaintiff Carecapital, LLC is a Texas limited liability company headquartered at 1911 Bagby Street in Houston. It provides financing, treasury, and administrative support within the affiliated enterprise and maintains accounts and payment relationships used to support healthcare operations.

33. Plaintiff Atul 'Lucky' Chopra is a Texas resident and physician-entrepreneur whom Titan required to sign each instrument both for the merchant and as personal guarantor.

34. Defendant Titan Capital GRP is the name Titan used on every agreement. Titan disclosed no entity suffix, formation jurisdiction, registered office, or street address. It stated only that it has 'a place of business in Connecticut and New York.' Titan's precise legal form and citizenship are peculiarly within its knowledge and will be established in discovery.

35. Upon information and belief, Titan provides commercial sales-based financing over the Internet to recipients throughout the United States, including Texas, and conducts a business of originating, servicing, refinancing, and collecting high-rate loans disguised as receivables purchases.

36. Defendant David A. Jaskowlski is an individual who resides at 1441 Robbins Lane, Seaford, New York 11783. Upon information and belief, Jaskowlski operates as a solicitation arm of the enterprise, solicits borrowers, coordinates with MCA brokers, and acts as a negotiator and front person for the enterprise's transactions. Jaskowlski introduced Plaintiffs to Getter, with whom he had worked for years, and earned a commission on each Titan transaction he brokered.

37. Defendant Excelsior Capital Services LLC is a limited liability company owned and controlled by Jaskowlski and, upon information and belief, has its principal place of business in New York. Excelsior held itself out as a provider of subordinate, accounts-receivable, equipment, inventory, bridge, and long-term financing; solicited Plaintiffs; introduced Plaintiffs to Getter and Titan; transmitted and negotiated Titan's documents and terms; and received or benefited from commissions on the challenged transactions. The identity and citizenship of each of Excelsior's members are peculiarly within Defendants' knowledge and will be established in discovery.

38. Nonparty Getter is Titan's organizer, operator, controlling mind, and culpable natural person. Upon information and belief, Getter directed Titan's underwriting, form documents, funding, ACH collection, refinancing, default, and enforcement practices, both before and after filing his personal bankruptcy case.

39. On July 7, 2026, Getter filed Chapter 7 in the United States Bankruptcy Court for the Southern District of Florida, Case No. 26-18907. Titan nevertheless issued four of the five challenged agreements after that filing: July 10, July 16, July 30, and August 5, 2026.

## FACTUAL ALLEGATIONS

### A. Jaskowlski Used a Promised Refinancing to Carrot Plaintiffs Into Serial Titan MCAs

40. On June 8, 2026, Jaskowlski, acting through Excelsior, solicited Chopra and represented that Excelsior 'specializes in financing that sits behind an existing senior facility' and could provide accounts-receivable, equipment, inventory, and bridge financing without disturbing Plaintiffs' senior lender.

41. On June 15, 2026, Jaskowlski, acting through Excelsior, followed up by offering to start AD Healthcare with a '$2–5M facility on a bridge basis' that could be funded immediately behind its senior lender and with 'no disruption to that line.' Plaintiffs understood that Jaskowlski was offering conventional subordinate or bridge financing, not a succession of daily-debit MCAs.

42. By June 29 and 30, 2026, Jaskowlski was discussing the line items of a proposed thirty-six-month term sheet and represented that the larger facility could close within four to six weeks after receivables verification. He asked Plaintiffs for information about the proposed facility's fee, rate, subordination, and treatment of existing MCAs so that he could keep the transaction 'in motion.'

43. At the same time, Jaskowlski asked to bring his 'short term capital partner' into the discussions concerning interim funding. That partner was Getter. Jaskowlski thereby introduced Plaintiffs to Getter and caused them to consider Titan's MCA as a temporary bridge while Jaskowlski purportedly pursued the larger refinancing.

44. The emails show that Jaskowlski was not a passive referral source. He forwarded Titan documents, communicated Getter's funding deadlines, negotiated Titan's origination fee and payment period, directed that revised documents be sent, and told Plaintiffs that Getter would commit to fund them 'weekly' and could 'stretch every deal as he moves forward.'

45. When Plaintiffs objected that Titan's first documents required a $43,500 daily debit on a $1,305,000 face amount—an apparent thirty-day term—and permitted underwriting and origination fees as high as 15% and 28%, respectively, Jaskowlski called those terms a 'clerical mistake' and proposed a 5% fee, $17,400 daily debit, and seventy-five-day term.

46. After Plaintiffs rejected even those terms and demanded a 3% fee and a 150-day period, Jaskowlski conferred directly with Getter, reported that Getter accepted the 3% fee, and continued negotiating the duration. Getter then resent documents for 120 days on the same $900,000 advance, and Jaskowlski stated that he preferred Getter to put funding in 'week over week' for Plaintiffs.

47. The promised larger refinancing was the carrot. The repeated Titan MCAs were the intended product. Rather than deliver the represented long-term facility, Jaskowlski and Getter used Plaintiffs' immediate liquidity needs and the expectation of a forthcoming refinancing to induce five short-term Titan transactions in thirty-six days.

48. Upon information and belief, Jaskowlski and Excelsior earned or benefited from a commission on each Titan MCA. Every new advance therefore generated compensation for Jaskowlski and Excelsior, while its balance-transfer structure retired Titan's prior face balance, generated a new fixed return for Titan and the enterprise, and increased Plaintiffs' daily payment burden.

49. Jaskowlski and Getter had worked together for years before these transactions. Jaskowlski acted through Excelsior, and their established relationship, coordinated

communications, division of functions, repeated use of Titan documents, and shared financial interest enabled them to solicit, price, document, fund, refinance, and collect the challenged loans as a continuing enterprise rather than as an isolated referral.

**B. Titan Swept a Healthcare System Into Its Collateral**

50. Titan's one-page merchant block identifies Zoo Capital, AD Hospital East, and Carecapital collectively as the 'Merchant,' even though they perform distinct holding, hospital, and administrative functions and do not generate the same receivables.

51. Titan's June 30 addendum goes further. It purports to add as jointly and severally liable 'Sellers' at least eleven affiliates, including Diagnostic Interventional and Vascular Consultants LLC, Texas Brain Center LLC, River Oaks Hospital & Clinics LLC, Advanced Houston Specialty Hospital, and Advanced Diagnostics Health Systems LLC d/b/a Advanced Diagnostics Healthcare.

52. The addendum also lists hospitality businesses. This indiscriminate aggregation confirms that Titan did not purchase a defined pool of healthcare accounts or evaluate the payment risk of particular patients, insurers, government programs, restaurants, or other account debtors.

53. Instead, Titan sought blanket repayment support from every affiliated revenue source and asset it could list. The purported sale therefore shifted no account-debtor collection risk to Titan; it concentrated enterprise-wide credit risk on Plaintiffs and their affiliates.

54. The security agreement reinforces that result. It gives Titan a lien on every present and future UCC category, all proceeds, all money in every merchant and guarantor account 'regardless of the source,' and—if any account is insufficient—'all of Merchant's assets of any kind whatsoever.'

55. Titan claims it may freeze or withdraw collateral without notice, notify account debtors ‘at any time,’ control disposition, execute instruments in Plaintiffs’ names, and file any UCC notice it deems useful. Those rights are lender remedies, not the rights of a buyer confined to 40% of identified receivables.

56. For healthcare providers, the threat is not merely monetary. A blanket UCC or payor notice can cause Medicare contractors, Medicaid plans, commercial insurers, and revenue-cycle vendors to hold payments, demand legal review, restrict access to confidential claims information, or treat the provider’s payment instructions as disputed.

57. A freeze or redirection of healthcare operating funds would immediately threaten wages, physician coverage, pharmaceuticals, implants, imaging and laboratory supplies, emergency-room staffing, utilities, and vendors whose timely performance is necessary for patient care.

## C. The Five Fixed-Term Loans

58. On June 30, July 10, July 16, July 30, and August 5, 2026, Titan transmitted materially identical agreements to Plaintiffs through DocuSign and received electronically executed copies and ACH authorizations.

59. The following figures are taken directly from the face of Titan’s agreements. ‘Implied Daily Receipts’ equals the fixed daily debit divided by the stated 40% purchased percentage. ‘Payoff Days’ equals the Purchased Amount divided by the fixed daily debit. The annualized rate uses 260 business days and excludes all additional fees:

| Date | Advance | Face Amount | Daily Debit | Implied Daily Receipts | Payoff Days | Annualized Rate |
|---|---|---|---|---|---|---|
| 6/30/26 | $900,000 | $1,260,000 | $10,500 | $26,250 | 120 | 86.7% |
| 7/10/26 | $1,950,000 | $2,730,000 | $22,750 | $56,875 | 120 | 86.7% |
| 7/16/26 | $3,250,000 | $4,550,000 | $37,916.66 | $94,791.65 | 120 | 86.7% |
| 7/30/26 | $4,750,000 | $6,650,000 | $47,500 | $118,750 | 140 | 74.3% |
| 8/5/26 | $7,075,000 | $9,905,000 | $60,000 | $150,000 | 165.08 | 63.0% |

60. Each transaction has the same 1.40 factor rate. Each produces a predictable term. And even without underwriting, origination, management, blocked-ACH, default, UCC, and stacking fees, each rate exceeds 56%—twice Texas's maximum 28% ceiling for commercial credit. *See* Tex. Fin. Code § 303.009(c).

61. Titan's 'estimated' daily receipts rose from $26,250 on June 30 to $56,875 ten days later; to $94,791.65 six days after that; to $118,750 fourteen days later; and to $150,000 six days after that.

62. Titan did not receive five successive revenue reports showing those implausible jumps. Nor did it alter the stated 40% purchased percentage. It simply increased the debit as the loan size increased.

63. *Lateral Recovery* rejected the same arithmetic. There, it was 'not tenable' that a distressed merchant's receivables increased sevenfold in less than a month, and the only consistency was that the daily payment increased with the purchased amount. 2024 U.S. Dist. LEXIS 176985, at *83. That pattern was 'consistent with a loan to be repaid over a fixed period, not a purchase of receivables.' *Id.*

64. *Golden Foothill* applied that reasoning at the pleading stage and sustained allegations that escalating 'good faith estimates,' payoff discussions framed in days, day-one defaults, and broad guarantees described loans. 2025 U.S. Dist. LEXIS 160562, at *21–25.

65. Titan's own ACH authorization contradicts the front page. The front page says Titan purchased 40%, while the ACH form states 'Percentage of each Banking Deposit: 20%.' That unexplained mismatch confirms the documents were not designed to remit an agreed receivables share.

**D. Titan's Refinancing Treadmill**

66. Titan did not fund the stated 'Purchase Price' as new working capital each time. It required later advances to pay Titan's existing face balance.

67. On July 10, Titan deducted $1,186,500 from the stated $1,950,000 advance to retire the June 30 instrument, leaving at most $763,500 before Titan's other fees.

68. On July 16, Titan deducted $2,639,000 from the stated $3,250,000 advance to retire the preceding balance, leaving at most $611,000 before fees.

69. On August 5, Titan deducted $6,412,500 from the stated $7,075,000 advance to retire the July 30 instrument, leaving at most $662,500 before fees.

70. Those balance-transfer figures also document at least $402,000 in fixed ACH collections before the listed refinancings: $73,500 on the first instrument, $91,000 on the next, and $237,500 on the July 30 instrument.

71. The refinancing device capitalized Titan's prior face balances into larger instruments and increased the next fixed debit. It did not involve Titan buying newly identified receivables; it involved Titan rolling debt.

72. The July 16 instrument purported to use $2,639,000 to satisfy an earlier obligation that was itself void or unenforceable as a usurious loan. Titan cannot create valid consideration by refinancing a void balance, nor can a cross-collateral clause revive that balance.

73. The five instruments recite aggregate 'Purchase Prices' of $17,925,000 and aggregate 'Purchased Amounts' of $25,095,000, but the balance transfers show that much of the supposed new consideration never reached Plaintiffs. Titan used ledger entries and wires to compound its collection entitlement.

### E. Reconciliation Was Discretionary, Burdensome, and Prospective Only

74. Titan says reconciliation is available only once per calendar month, only by written request to a generic Gmail address, and only if Plaintiffs supply every bank statement, merchant-processing statement, receivables report, financial record, and additional item Titan requests.

75. Titan also demands continuous online viewing access to Plaintiffs' bank accounts through a third-party service and permits itself to demand additional documents. The fixed ACH debit continues while Titan considers the request.

76. The agreement does not require Titan to grant reconciliation by a deadline, issue a reasoned decision, refund prior overcollections, or restore funds needed for a healthcare emergency. It states only that Titan 'may' adjust the debit.

77. The separate adjustment clause is also conditioned on no default or breach, measures only the preceding two weeks, and lasts only two weeks before snapping back to the original debit unless Plaintiffs repeat the process.

78. *Togut* holds that materially identical provisions are illusory when the funder retains discretion, reconciliation works only prospectively, and the contract requires no refund of overcollections. 2026 Bankr. LEXIS 1850, at *21–27.

79. The practical defect is more severe here. Titan drafted broad events of default that disable reconciliation whenever Plaintiffs need it most—when receipts fall, another creditor has a lien, an ACH is returned, or the operating account must change.

### F. Titan Engineered Default and Absolute Repayment

80. Titan recites that bankruptcy, cessation, slowdown, or delayed receivables 'in and of itself' is not a breach. But the remainder of the form makes a non-default business failure practically impossible.

81. Any breach of any term is a default. So are an allegedly false representation, an intent to breach, a material adverse change, other financing, multiple depository accounts, changing or closing an account, and failing to provide twenty-four hours' notice and documents after insufficient funds.

82. Titan requires Plaintiffs to represent that no one else has a lien on any collateral. Yet Titan's refinancing strategy and its knowledge of affiliated healthcare financing make clear that competing liens can exist. The form converts that representation into a day-one default that Titan may invoke to deny reconciliation.

83. On any default, the purchased percentage becomes 100%; the entire uncollected face amount and fees accelerate; Titan may debit any depository account; all assets become collateral; and Titan may enforce Chopra's guaranty.

84. The form adds an underwriting fee of up to 15%, an origination fee of up to 28%, monthly management fees, a $5,000 blocked-ACH/default fee, a default fee up to 10% of funded amount, a stacking fee up to 10% of purchased amount, UCC fees, and collection expenses.

85. The agreement also prohibits other financing and account changes, grants Titan a power of attorney, and requires Plaintiffs to give Titan bank-login credentials. These provisions protect an absolute debt; they do not allocate the upside and downside of account-debtor performance.

86. *Togut* explains why Titan's bankruptcy carve-out is theoretical: broad defaults are highly likely to occur before bankruptcy, at which point acceleration, all-assets security, and the guaranty restore full recourse. 2026 Bankr. LEXIS 1850, at *33–41.

87. *Greenwich Retail Group LLC v. Moby Capital, LLC (In re Greenwich Retail Group LLC)*, 677 B.R. 473, 496–505 (Bankr. S.D.N.Y. 2026), likewise holds that courts must

test whether contingencies are realistic, not mechanically accept paper carve-outs that the rest of the contract neutralizes.

88. The First Department recently affirmed that fixed daily payments not based on good-faith estimates, a reconciliation practice that did not function, and defaults triggered by business interruption and similar events demonstrated loans and usurious intent as a matter of law. *People v. Richmond Capital Group LLC*, 246 A.D.3d 585, 586–87 (1st Dep't 2026).

**G. Titan Did Not Purchase Receivables**

89. A true receivables purchaser identifies an asset, evaluates the account debtor, pays a purchase price tied to its value, receives the collection rights and collection risk, and shares in upside and downside.

90. Titan did none of that. It did not identify a patient account, payer, invoice, service date, claim number, aging schedule, expected payment, denial risk, reimbursement rate, or collection history.

91. Titan calculated the 'Purchased Amount' as exactly 140% of each advance, collected a fixed daily amount from general deposits, and looked to Plaintiffs, their guarantor, accounts, affiliates, and every asset if a third-party payor did not pay.

92. *Togut* held that the absence of identified accounts, collection responsibility, payments tied to actual receipts, and upside/downside sharing confirms that such agreements are loans. 2026 Bankr. LEXIS 1850, at *41–46.

93. Substance controls over labels. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021). A party not directly exposed to the market risk of the underlying assets is a lender, not an investor. *Id.*; *see also Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247–49 (S.D.N.Y. 2022).

**H. The Loans Are Unlawful Debt**

94. Texas law applies to the Texas transactions, recipients, operating accounts, and injuries. Chapter 398 expressly applies to online providers regardless of physical presence and removes commercial sales-based financing from the conclusive 'account purchase' safe harbor. Tex. Fin. Code §§ 398.002, 398.004.

95. Once recharacterized as credit, the agreements' facial rates exceed Texas's lawful commercial ceilings. Even using the most lender-favorable maximum ceiling of 28%, twice the enforceable rate is 56%. Titan's facial rates of approximately 63% to 86.7%, before fees, exceed that RICO threshold.

96. The June 30 and July 10 loans also fall below New York's $2.5 million usury exemption and carry rates far above New York's 25% criminal limit. Titan operated from New York, transmitted and funded through New York, selected New York enforcement, and made the loans in its New York-centered lending business.

97. A criminally usurious New York loan is void ab initio. *Adar Bays*, 37 N.Y.3d at 338–39; N.Y. Gen. Oblig. Law §§ 5-511, 5-521; N.Y. Penal Law § 190.40.

98. To the extent Titan invokes the stated Connecticut choice-of-law clause to avoid Texas or New York public policy, the clause is unenforceable. Titan cannot contract around Chapter 398's express application to Texas recipients or select a law whose purpose would be to validate unlawful debt made and collected through its New York operations.

99. The later instruments with stated advances of $2.5 million or more remain loans even if Titan invokes New York's amount-based usury exemption. They are independently subject to Texas law and Titan's rates exceed twice Texas's highest commercial ceiling. They also incorporate void predecessor balances, prohibited ACH mechanisms, federally restricted payment rights, and the challenged PJR/UCC devices.

**I. Titan's Claimed Ownership of Medicare and Medicaid Payments Is Unlawful**

100. AD Hospital East and affiliated providers furnish services reimbursed by Medicare, Medicaid, managed-care organizations, and commercial insurers. Those receipts are essential to patient care and regulated provider operations.

101. Medicare provider payments may not be made to another person under an assignment or power of attorney except for narrow governmental, court-ordered, or true billing-agent arrangements. 42 U.S.C. § 1395g(c); 42 C.F.R. § 424.73.

102. Medicaid payments generally may be made only to the provider or beneficiary. Federal regulations define a 'factor' as an organization that advances money against receivables assigned, sold, or transferred for a fee or deduction and prohibit payment to or through a factor, directly or by power of attorney. 42 C.F.R. § 447.10(b), (d), (h); *see* 42 U.S.C. § 1396a(a)(32).

103. A permitted billing agent must receive payment in the provider's name, act only for the provider, and receive compensation unrelated to the amount billed or collected and not dependent on collection. 42 C.F.R. §§ 424.73(b), 447.10(f). Titan satisfies none of those conditions.

104. Congress adopted these restrictions to stop organizations from purchasing government healthcare receivables and submitting or receiving program payments in their own names. *Danvers Pathology Associates, Inc. v. Atkins*, 757 F.2d 427, 430 (1st Cir. 1985).

105. Federal law does not necessarily prevent a creditor from taking a valid lien in proceeds after government funds first reach the provider. *See DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 350 (7th Cir. 2004). But Titan claimed far more: 'absolute ownership' of the government claim itself, a power of attorney, direct-payor notification and redirection, endorsement rights, account control, and immediate withdrawal or freezing.

106. Titan's asserted rights are integral to its claim that the transactions are sales. Their illegality and inability to transfer direct payment expose the sale label as false and leave Titan with only lender-like recourse against Plaintiffs' general assets.

107. CMS may terminate a provider agreement if a provider executes or continues a prohibited payment arrangement. 42 C.F.R. § 424.74. Titan's threats therefore risk regulatory harm that cannot be repaired by a later damages award.

**J. Texas Prohibits Titan's Automatic-Debit Mechanism**

108. Chapter 398 defines sales-based financing to include either percentage payments that vary with sales or a fixed-payment mechanism with reconciliation. Tex. Fin. Code § 398.001(8). Titan's transactions fall within that definition under its own characterization.

109. A provider may not establish a mechanism for automatically debiting a Texas recipient's deposit account unless it holds a validly perfected first-priority security interest. Tex. Fin. Code § 398.056.

110. Effective July 9, 2026, 7 Tex. Admin. Code § 86.313 confirms that advance-authorized recurring debits are automatic; the lien must be perfected and first in priority as to all accounts receivable; and the provider may not accept or direct a third party to complete a prohibited debit.

111. Titan's July 10, July 16, July 30, and August 5 agreements each established recurring daily ACH debits after the rule became effective. Titan's own forms do not establish a perfected first-priority interest; they merely demand an unsupported representation and reserve a future right to file.

112. The June 30 transaction also postdates Chapter 398's September 1, 2025 effective date and is directly governed by § 398.056.

113. Titan's form also contains the precise evasion the Texas regulator rejected: it claims a blanket lien while using recurring debits, without demonstrating priority and while making the recipient bear the risk that another creditor filed first.

114. Section 398.102 states that Chapter 398 does not create a private right of action. Plaintiffs therefore do not seek Chapter 398 civil penalties or statutory damages. They seek declarations concerning their contractual and property rights and prospective equitable relief under 28 U.S.C. §§ 2201–2202 and common law; §§ 398.055–.056 supply mandatory Texas rules of illegality and public policy relevant to whether Titan may enforce the ACH and PJR provisions.

**K. Titan Threatens Irreparable Harm Through ACH, UCC Notices, and Connecticut PJR**

115. Titan's latest agreement authorizes a $60,000 debit every business day—approximately $300,000 per five-day week—from accounts supporting healthcare operations.

116. Titan claims that insufficient funds, a bank-code return, or an account change can trigger default, 100% of receipts, acceleration of the full $9,905,000 face amount, a ten-percent default fee, all-assets remedies, and personal-guaranty liability.

117. Titan also claims authority to notify any account debtor 'at any time,' redirect payments, freeze accounts, and file UCC notices. A UCC or lien notice to CMS, a Medicare contractor, a Medicaid managed-care plan, an insurer, or a bank would create immediate payment, confidentiality, compliance, and goodwill injury.

118. Section 4.13 of Titan's form purports to waive notice, hearing, and bond and authorize a Connecticut prejudgment remedy against any account held by a bank with a Connecticut branch or registration. Connecticut's PJR statute defines the remedy to include attachment and garnishment that deprives or affects the use of property before judgment. Conn. Gen. Stat. §§ 52-278a(d), 52-278f.

119. Because national banks are registered or maintain branches in Connecticut, Titan's clause purports to reach Plaintiffs' Texas healthcare operating accounts and Chopra's personal accounts without a merits judgment.

120. Texas Finance Code § 398.055 renders a commercial sales-based financing contract containing a confession of judgment 'or any similar provision' void. Plaintiffs allege that Titan's contractual authorization for ex parte attachment without notice, hearing, or bond is a similar self-executing collection device and is void.

121. There is an actual, immediate controversy. Titan claims enforceable ownership, ACH, security, guaranty, UCC, payor-notice, and PJR rights; Plaintiffs contend those claimed rights arise from loans and illegal or void provisions and must not be exercised.

122. Money damages cannot restore interrupted emergency care, repair a threatened Medicare provider agreement, recreate confidential payor relationships, or undo the immediate reputational effect of a lien notice asserting that healthcare receivables belong to an MCA funder.

**L. Getter, Jaskowlski, Excelsior, and the Titan Enterprise**

123. Getter organized and controls an association-in-fact enterprise (the 'Getter-Titan Enterprise') that includes Getter, Jaskowlski, Excelsior, Titan, third-party brokers or independent sales organizations, outside funding participants, ACH processors, bank-verification vendors, and UCC or collection vendors.

124. The Getter-Titan Enterprise has the common purpose of soliciting merchants, advancing capital, disguising fixed-term loans as receivables sales, automatically collecting the loans, refinancing balances into larger instruments, and enforcing them through ACH, UCC, guaranty, and prejudgment-remedy devices.

125. The members have relationships enabling the scheme: Jaskowlski, acting through Excelsior, and other brokers deliver borrowers and data, with Jaskowlski acting as a negotiator and front person; Getter directs and approves transactions; Titan contracts, advances, books, and collects; outside funders supply or participate in capital; processors transmit recurring debits; and collection vendors implement liens, payor notices, and remedies.

126. The enterprise has longevity sufficient to execute multiple transactions, service daily debits, refinance balances, and pursue collection. Its structure and participants exist beyond any one loan and beyond Titan's internal corporate hierarchy.

127. Titan, Jaskowlski, and Excelsior are RICO 'persons' distinct from the association-in-fact enterprise, which includes a natural person and legally independent third parties. Titan conducted and participated in the enterprise's affairs through its own contracts, wires, advances, debits, refinancing, and asserted collection rights.

128. Getter is the culpable natural person and directing mind. He had authority over Titan's underwriting, pricing, form terms, funding, servicing, and enforcement, knew the payment amounts were not good-faith estimates, and intended the enterprise to collect fixed returns regardless of receivables performance.

129. Jaskowlski is responsible for operating the enterprise's solicitation arm. He solicits borrowers and coordinates with other MCA brokers to carry out the enterprise's lending and collection scheme.

130. Excelsior functioned as the enterprise's solicitation and brokerage entity. Through Jaskowlski, its owner and controlling person, Excelsior sourced Plaintiffs, represented that it could provide durable subordinate and long-term financing, introduced Getter as its short-term capital partner, negotiated Titan's terms and documents, and earned or benefited from transaction-based commissions.

131. Jaskowlski had worked with Getter for years and introduced Plaintiffs to him as the enterprise's source of short-term capital. Their established relationship permitted Jaskowlski to negotiate directly with Getter over Titan's fees, payment periods, documentation, timing, and continuing weekly funding.

132. Jaskowlski used the promised $2–5 million bridge facility and proposed thirty-six-month refinancing to induce Plaintiffs to accept Titan's short-term loans while purportedly waiting four to six weeks for the larger facility to close. The larger facility never closed; Titan instead issued five loans in thirty-six days.

133. Because Jaskowlski and Excelsior earned or benefited from a commission on each Titan transaction, they personally benefited from the repeated refinancing cycle. The compensation structure aligned their interests with Getter and Titan and supplied a motive to keep Plaintiffs accepting new high-cost MCAs rather than obtain the durable financing they had promised.

134. Jaskowlski and Excelsior solicited Plaintiffs directly or through brokers, acted as a negotiator and front person for the enterprise, and participated in directing Plaintiffs toward the Titan transactions at issue. Jaskowlski and Excelsior shared the enterprise's common purpose and financial incentive to originate, refinance, service, and collect the challenged high-cost obligations under the guise of receivables purchases.

135. Getter's July 7, 2026 bankruptcy did not stop the scheme. Titan transmitted and executed four successive loans after the petition date. Plaintiffs seek no judgment against Getter; these allegations establish Titan's knowledge, intent, agency, participation, and the enterprise's continuing operation.

136. The Supreme Court recognizes the formal and practical distinction between a culpable natural person and a corporation used as the vehicle for racketeering. *Cedric Kushner*

*Promotions, Ltd. v. King*, 533 U.S. 158, 163, 165–66 (2001). The Getter-Titan Enterprise is broader still because it includes independent brokers, funders, processors, and collection vendors.

**M. Titan's Interstate Wires and False Statements**

137. On June 30, July 10, July 16, July 30, and August 5, 2026, Titan used interstate electronic communications and DocuSign to transmit agreements falsely stating that Titan purchased receivables, that the daily debit was a good-faith estimate, that no fixed term existed, and that Titan genuinely assumed business-downturn and collection risk.

138. Titan caused funding wires and balance-transfer ledger entries on those dates and caused repeated interstate ACH instructions to debit Plaintiffs' Texas accounts and transfer money to accounts used by Titan and the enterprise.

139. The statements were false when made. Titan's fixed 1.40 factor, advance-sized daily debits, predictable payoff periods, prospective discretionary reconciliation, all-assets collateral, day-one defaults, acceleration, and guaranty show that Titan intended loans and absolute collection.

140. Titan, Getter, and Jaskowlski knew the daily figures were not revenue estimates because they set them without corresponding revenue data and changed them in lockstep with the advance size while leaving the purported 40% purchase unchanged.

141. Defendants intended Plaintiffs to rely on the sale label and good-faith-estimate representation to sign the instruments, grant bank access and ACH authority, accept rolled-over funding, and refrain from invoking usury and regulatory protections.

142. Plaintiffs reasonably relied on Titan's superior knowledge of the product it drafted and on Titan's express assertion that it assumed the risk of slowed or failed receivables. Plaintiffs executed the documents, accepted funds, permitted debits, and became encumbered.

143. Titan's electronic agreements, funding wires, ACH debits, processor instructions, bank-verification transmissions, and threatened collection communications are interstate wires used to execute, conceal, and collect the scheme.

## COUNT I
### Civil RICO — 18 U.S.C. § 1962(c)
### (Collection of Unlawful Debt and Pattern of Wire Fraud)

144. Plaintiffs repeat and reallege every preceding paragraph.

145. Titan, Jaskowlski, and Excelsior are 'persons' under 18 U.S.C. § 1961(3) and are employed by or associated with the Getter-Titan Enterprise, an enterprise under § 1961(4) engaged in and affecting interstate commerce.

146. Titan, Jaskowlski, and Excelsior conducted and participated, directly and indirectly, in the enterprise's affairs by originating, transmitting, funding, servicing, refinancing, debiting, and enforcing the five transactions.

147. The transactions are 'unlawful debt' under 18 U.S.C. § 1961(6) because they are debt unenforceable in whole or in part under Texas and, as to applicable instruments, New York usury law; they were incurred in the enterprise's business of lending money at usurious rates; and their rates were at least twice the enforceable rate.

148. A single collection of unlawful debt is sufficient under § 1962(c). *See United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020). Titan nevertheless collected repeatedly through daily ACH debits and balance transfers.

149. Titan also conducted the enterprise through a pattern of wire fraud in violation of 18 U.S.C. § 1343, including at least the five contract transmissions, corresponding funding wires, recurring ACH debits, processor instructions, and refinancing communications alleged above.

150. The pattern also included Jaskowlski's and Excelsior's interstate emails offering a $2–5 million bridge facility, pursuing a thirty-six-month refinancing, representing a four-to-six-

week closing period, introducing Getter as their short-term capital partner, transmitting and revising Titan documents, negotiating fees and terms, and promoting continuing weekly Titan funding.

151. Those communications were integral to the scheme because they supplied the carrot that induced Plaintiffs to enter and remain in the serial-MCA cycle, concealed Jaskowlski's and Excelsior's transaction-by-transaction commission incentive, and enabled Titan to make and collect unlawful debt through repeated interstate documents, wires, and ACH debits.

152. The predicate acts share participants, victims, methods, purposes, false statements, documents, accounts, and results. They occurred over multiple transactions, were open-ended when committed, and threaten continued repetition against Plaintiffs and other merchants.

153. Titan, Jaskowlski, and Excelsior acted knowingly and intentionally. Titan and Excelsior acted through their authorized participants, including Getter and Jaskowlski. Titan knew the 'good faith estimates' were keyed to advance size, not receivables; knew reconciliation was discretionary and prospective; and drafted remedies guaranteeing repayment after predictable defaults.

154. By reason of Titan's § 1962(c) violation, Plaintiffs suffered direct injury to business and property, including at least $402,000 in documented pre-refinancing ACH collections, additional debits and fees to be proven, rolled and inflated balances, bank charges, encumbrances, impaired credit and business relationships, and professional costs incurred to protect their property.

155. Plaintiffs are entitled to recover threefold their damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c), together with declaratory and other relief authorized by law.

## COUNT II

### Civil RICO Conspiracy — 18 U.S.C. § 1962(d)

156. Plaintiffs repeat and reallege every preceding paragraph.

157. Titan, Jaskowlski, and Excelsior knowingly agreed with Getter and other Getter-Titan Enterprise participants to further an endeavor that, if completed, would satisfy § 1962(c): the making and collection of unlawful debt and repeated use of interstate wires to disguise and collect it.

158. Titan, Jaskowlski, and Excelsior knew the essential nature of the scheme, shared its objective, and agreed to facilitate it by supplying the form contracts, pricing, funding, balance transfers, ACH collection, bank access, liens, guaranty, and enforcement mechanisms.

159. The agreement is shown by the repeated coordinated roles alleged above and by Defendants' continued execution of four transactions after Getter's personal bankruptcy filing.

160. Defendants and their co-conspirators committed overt acts in furtherance of the conspiracy, including the contract transmissions, funding wires, daily debits, balance transfers, processor instructions, and asserted UCC/PJR rights.

161. Plaintiffs were directly injured in business and property by reason of the conspiracy and are entitled to treble damages, fees, costs, and all relief available under 18 U.S.C. § 1964(c).

## COUNT III

### Declaratory Judgment, Rescission, and Cancellation of Instruments (28 U.S.C. §§ 2201–2202; Applicable State Law)

162. Plaintiffs repeat and reallege every preceding paragraph.

163. An actual controversy exists concerning the character, validity, amount, and enforceability of the five MCA instruments, the balance-transfer agreements, guaranty, security agreements, powers of attorney, ACH authorizations, and existing or threatened UCC filings.

164. The transactions are loans in substance. The June 30 and July 10 instruments are criminally usurious under applicable New York law and void ab initio. Each transaction is independently subject to Texas's recharacterization and usury rules, and the rates exceed Texas's lawful ceilings.

165. The successor instruments incorporate or purport to satisfy void predecessor balances, impose indivisible cross-default and cross-collateral obligations, and were induced by the same false sale and good-faith-estimate representations.

166. The instruments' purported assignment and direct-collection rights are illegal and unenforceable as applied to Medicare and Medicaid provider claims and payments. Titan acquired no right to receive such payments directly, redirect them by power of attorney, or claim absolute ownership against government payors.

167. The Connecticut PJR waiver is void under Texas Finance Code § 398.055 because it is a provision similar to a confession of judgment, purporting to authorize deprivation of property before judgment without notice, hearing, or bond.

168. Any UCC financing statement securing a void obligation or claiming ownership beyond a permissible lien in proceeds is unauthorized, creates a false or misleading record, and must be terminated. The guaranty and power of attorney fall with the principal obligation and are independently unenforceable to the same extent.

169. Plaintiffs are entitled to declarations establishing those rights, rescission or cancellation of the instruments as appropriate, an accounting eliminating all void or unlawful balances, and an order directing Titan to file UCC-3 termination statements for any filing based on the void security grants.

## COUNT IV

**Declaratory and Injunctive Relief**
**(Unlawful ACH, PJR, UCC, and Healthcare-Payor Collection)**

170. Plaintiffs repeat and reallege every preceding paragraph.

171. Titan's recurring ACH mechanism violates Texas Finance Code § 398.056 and 7 Tex. Admin. Code § 86.313 unless Titan proves that, before establishing the mechanism, it held a validly perfected first-priority security interest in all accounts receivable of the recipient.

172. Titan has not identified such perfection or priority. Contract language declaring Titan first does not establish priority against other persons under Article 9.

173. Plaintiffs do not assert statutory damages or a civil penalty under Chapter 398. They seek prospective protection of independently established contract and property rights, a declaration under 28 U.S.C. §§ 2201–2202, and traditional equitable relief preventing enforcement of void or illegal contractual mechanisms.

174. Plaintiffs have succeeded, or are likely to succeed, on the merits because the instruments are loans; their payment estimates are mathematically fictitious; reconciliation is illusory; Titan did not transfer collection risk; the early instruments are criminally usurious; the transactions exceed Texas ceilings; and the challenged ACH, PJR, government-payment, and UCC devices violate governing law and public policy.

175. Plaintiffs face imminent irreparable harm from recurring withdrawals, a threatened multi-million-dollar acceleration, ex parte account attachment, payor and UCC notices, confidential reimbursement disruption, potential Medicare-provider consequences, loss of goodwill, and interruption of hospital operations and patient care.

176. The balance of hardships overwhelmingly favors maintaining healthcare funds and reimbursement relationships while the Court determines the instruments' validity. Titan can

be protected, if appropriate, by an accounting and final judgment; patients and provider relationships cannot be restored after disruption.

177. The public interest favors compliance with Texas's automatic-debit rule, federal healthcare-payment restrictions, due process in prejudgment remedies, accurate UCC records, and uninterrupted emergency and hospital care.

178. Plaintiffs are entitled to preliminary and permanent injunctions requiring Titan and persons acting in concert with it to stop unauthorized ACH debits; refrain from invoking the contractual PJR waiver; refrain from filing or disseminating UCC or lien notices based on void security grants; refrain from contacting payors to claim ownership or redirect Medicare or Medicaid payments; and preserve all transaction, underwriting, ACH, UCC, funding, and enterprise records.

## COUNT V

### Fraud and Fraudulent Inducement

179. Plaintiffs repeat and reallege every preceding paragraph.

180. Before the first Titan transaction, Jaskowlski and Excelsior represented that they could arrange a $2–5 million subordinate bridge facility without disrupting Plaintiffs' senior lender, pursued a proposed thirty-six-month facility, and represented that the larger refinancing could close in four to six weeks.

181. Jaskowlski and Excelsior introduced Getter as their short-term capital partner and represented, expressly and by omission, that Titan's funding would serve as temporary interim capital while the larger facility proceeded. Jaskowlski and Excelsior did not disclose that they would earn or benefit from a separate commission on each Titan MCA or that they and Getter intended to place Plaintiffs into repeated short-term transactions.

182. Those representations and omissions were material. Plaintiffs needed durable financing, objected repeatedly to Titan's short durations and high fees, and accepted the Titan transactions in reliance on Jaskowlski's promised refinancing and his representation that Getter would continue funding them as the larger transaction moved toward closing.

183. The promised facility never closed. Instead, Jaskowlski and Getter used the promised refinancing to induce five Titan loans in thirty-six days, each generating a commission or financial benefit for Jaskowlski and Excelsior, fixed returns and fees for Titan and the enterprise, and a new or enlarged daily-debit obligation for Plaintiffs.

184. On June 30, July 10, July 16, July 30, and August 5, 2026, Titan, acting through Getter, Jaskowlski, and other authorized representatives, transmitted written agreements through DocuSign stating that Titan was buying receivables, each fixed debit was a good-faith revenue estimate, no repayment term existed, and Titan genuinely assumed the risk of slowed or failed receipts.

185. Those representations concerned present facts and Titan's then-existing methodology and intent. They were false for the reasons alleged above and were not merely promises of future performance.

186. Defendants knew the statements were false because Jaskowlski and Excelsior controlled the refinancing solicitation and commission-bearing referrals, while Titan and Getter controlled the MCA pricing and documents; collectively, they knew that Titan set every face amount at 140% of the advance, selected debits to produce predictable payoff periods, changed the supposed revenue estimate only as the loan size changed, retained discretion over reconciliation, and preserved full recourse through default, acceleration, collateral, and guaranty provisions.

187. Defendants concealed that the later advances would be used substantially to pay Titan's earlier face balances, that broad defaults could eliminate reconciliation before a business downturn or insolvency, that its ACH rights required first-priority perfection under Texas law, and that government healthcare payments could not be paid to Titan as factor.

188. Defendants intended Plaintiffs to rely on the misrepresentations and omissions to execute the agreements, grant ACH and bank access, accept successive interim MCAs and refinancings, permit fixed collections, and refrain from challenging the loans.

189. Plaintiffs justifiably relied and were injured through ACH collections, fees, increased balances, encumbrances, impaired credit and banking relationships, and the costs of protecting their accounts and healthcare operations.

190. Defendants' fraud was willful, malicious, and directed by its controlling person. Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven, rescission, and all other available relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment against Defendants Titan Capital GRP, David A. Jaskowlski, and Excelsior Capital Services LLC as follows:

i. Declaring that the challenged transactions are loans, not true purchases of receivables;

ii. Declaring the June 30 and July 10, 2026 instruments criminally usurious and void ab initio, and declaring the remaining instruments void, rescindable, or unenforceable to the extent alleged, including because they incorporate void balances and illegal, indivisible collection rights;

iii. Declaring that Titan has no right to own, receive directly, redirect, endorse, or collect Medicare or Medicaid provider payments under an assignment or power of attorney and no right beyond any lawfully perfected lien in proceeds after receipt by the provider;

iv. Declaring the guaranty, powers of attorney, ACH authorizations, security grants, PJR waiver, and any UCC filings void or unenforceable to the extent they secure or enforce void, usurious, illegal, or nonexistent obligations;

v. Preliminarily and permanently enjoining Defendants and all persons in active concert or participation with it who receive notice from initiating or accepting recurring ACH debits absent proof of compliance with Tex. Fin. Code § 398.056 and 7 Tex. Admin. Code § 86.313;

vi. Preliminarily and permanently enjoining Defendants from invoking the contractual Connecticut PJR waiver, freezing or attaching Plaintiffs' or Chopra's accounts based on the challenged instruments, filing or disseminating lien notices based on void security grants, or contacting healthcare payors to assert ownership or redirect government-program payments, to the fullest extent permitted by law;

vii. Ordering Defendants to withdraw any pending payment redirection or lien notice and file UCC-3 termination statements for all financing statements based on void or unauthorized security interests;

viii. Ordering a complete accounting of every funding transfer, balance transfer, ACH debit, fee, refund, credit, payoff, UCC filing, and amount Defendants claim under each transaction;

ix. Awarding actual damages, treble damages under 18 U.S.C. § 1964(c), punitive damages where permitted, restitution, disgorgement, and prejudgment and post-judgment interest in amounts to be determined;

x. Awarding Plaintiffs their costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c) and any other applicable law;

xi. Preserving all underwriting, transaction, funding, bank-verification, ACH, UCC, communications, and enterprise records; and

xii. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: New York, New York
August 24, 2026

**HESKIN & PROPER, PLLC**
By: /s/ *Shane R. Heskin*
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, New York 10022
(917) 362-1313
shane@heskinproper.com
*Attorney for Plaintiffs*